IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| XCOAL ENERGY & RESOURCES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-0645 |
| | § | |
| NEW YORK MARINE & GENERAL | § | |
| INSURANCE COMPANY AND | § | |
| SOUTHERN MARINE & AVIATION | § | |
| UNDERWRITERS, INC., | § | |
| | § | |
| Defendants, | § | |

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[1] are Plaintiff's Motion for Partial Summary Judgment (Doc. 25) and Defendants New York Marine & General Insurance Company and Southern Marine & Aviation Underwriters, Inc., (collectively "Insurers" or "Defendants") Motion for Partial Summary Judgment (Doc. 28).  The court has considered the motions, the responses and replies, all other relevant filings, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendants' motion be **GRANTED**.

## I.  Case Background

This insurance case centers on the obligation of Insurers to pay Plaintiff's loss claims related to loads of metallurgical and

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 41.

steam coal that were not delivered to Plaintiff by Glamorgan Coal Resources, LLC, ("Glamorgan").

**A.   <u>Insurance Policy</u>**[2]

Plaintiff buys and trades coal, arranges logistics and transportation for the coal, and brokers sales of coal.[3]  For the period February 1, 2005, to February 1, 2006, Insurers issued Plaintiff an Ocean Marine Cargo Policy ("Policy") covering "all risks of direct physical loss of or damage to the subject matter insured from any external cause" except those specifically excluded.[4]  Four causes were excluded: 1) unexplained shortage and loss in weight or volume; 2) mysterious disappearance; 3) shortage discovered upon taking inventory; and 4) infidelity of Plaintiff or its employees.[5]  Loss claims "for shortage and/or leakage and/or loss in weight (or volume) shall not be recoverable hereunder unless proved by [Plaintiff] to be due to a fortuitous cause, accident or event."[6]

A paragraph labeled "Perils" specifically identified "seas,

---

[2]     The only policy addressed in the motions for partial summary judgment is the 2005-2006 policy (as the 2006-2007 policy did not become a part of the case until Plaintiff amended more than two months after the motions were filed). Therefore, the court limits its review to the 2005-2006 policy.

[3]     Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Ins. Investigator's Report ("Report") pp. 2-3.

[4]     Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy, Declarations p. 5.

[5]     <u>Id.</u>

[6]     <u>Id.</u>

fire, assailing thieves, jettisons, barratry of the Master or
Mariners, and all other perils, losses and misfortunes . . . that
have or shall come to the hurt, detriment or damage of the said
goods and merchandise, or any part thereof except as may be
otherwise provided for herein . . . ."[7]

The Policy defined "Goods Insured" as:

[L]awful goods and/or merchandise consisting principally
of, but not limited to, metallurgical coal and coke of
every kind and description and other goods directly
related to the business of [Plaintiff] including
manufactured products, raw materials or semi-processed
goods, products returned to [Plaintiff] for repair,
reconditioning and/or servicing and/or all other
interests handled by [Plaintiff] in the course of [its]
business and/or in the care, custody and control of the
[Plaintiff] whether in transit or store or elsewhere
anywhere in the world including all loading and unloading
risks, including prepaid freight and/or advanced freight
and freight payable "vessel lost or not lost" under
and/or on deck shipped by or consigned to [Plaintiff]
and/or [its] agents and/or others, [its] own merchandise
or that of others in which [it] may be interested. Also,
to cover all shipments made for the account of others
which [Plaintiff] may agree or receive instructions to
insure hereunder.[8]

Plaintiff must have had an insurable interest in shipments in order
for them to be covered.[9]

According to the Policy, Plaintiff was required to report,
"within thirty days after the end of each month . . . all shipments

---

[7]     Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine
Open Cargo Policy p. 5.

[8]     Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine
Open Cargo Policy, Declarations p. 2.

[9]     Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine
Open Cargo Policy p. 4.

and/or other risks coming within the terms and conditions of this Policy, and amounts declared and [to] pay the premiums thereon."[10] For storage risks, the "Schedule of Rates" set the premium at .033% of the values at risk on the last day of each month.[11]  Willful failure to declare goods and to pay premiums when due allowed Insurers the option of declaring the Policy null and void.[12]  A deductible of $10,000 applied to each adjusted claim.[13]  The Policy also covered "sue and labor" expenses, which included reasonable expenses incurred by Plaintiff related to efforts to safeguard and recover goods in whole or part.[14]

The liability limits were as follows:

Any one vessel, connecting conveyance or location:

U.S. $15,000,000.00 (or the equivalent in any other currencies), except that in the following cases liability shall be further limited to:

| | |
|---|---|
| $10,000,000.00 | while carried on deck and subject to an On Deck Bill of Lading on any one vessel (part of the overall limit per vessel); |
| $    NIL | any one aircraft or connecting conveyance; |
| $    NIL | in respect of any one package shipped by mail; |

---

[10]    Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy, Declarations p. 1.

[11]    Id. p. 6.

[12]    Id. p. 1.

[13]    Id. p. 5.

[14]    Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy p. 18.

$10,000,000.00       by any one barge in tow;
$ 2,500,000.00       by any one land conveyance; . . . .[15]

Ten storage locations that were named in the Policy each carried a specific limit of $3,000,000, $6,000,000, $10,000,000, or $15,000,000.[16] Otherwise, the Policy allowed a $1,000,000 limit "in respect of any one storage location."[17]

Plaintiff was required to report any loss as soon as the loss was known or expected.[18] Proofs of loss were to be authenticated by an agent of Insurers.[19]

## B.   The Coal Transactions

Beginning in June 2005, Plaintiff acted as the exclusive agent for marketing and selling the coking coal produced through Glamorgan's mining operations in Wise County, Virginia.[20] Glamorgan undertook mining and processing operations at the Wise County site

---

[15]    Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy, Declarations p. 3.

[16]    Id.; Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy, Endorsement Nos. 7, 9, 10.  Neither Glamorgan's facility nor the city in which it was located was listed among the specifically named locations.  See Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy, Declarations p. 3; Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy, Endorsement Nos. 7, 9, 10.

[17]    Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy, Declarations p. 3.

[18]    Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy p. 17.

[19]    Id.

[20]    Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Gayle F. Broughton's ("Broughton") Loss Statement, p. 1 (unnumbered); see also Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Report p. 1.

after its parent company acquired the mine in early 2005.[21] According to a proposed contract between Plaintiff and Glamorgan,[22] Glamorgan would mine and supply coal to meet Plaintiff's orders, taking responsibility for the costs associated with mining the coal, transporting it to a cleaning plant, cleaning the coal, and loading it onto the agreed transportation means.[23]  Plaintiff, on the other hand, would develop a marketing and sales plan for the coal and would order and purchase the coal from Glamorgan "f.o.b. rail cars loading point" for resale to Plaintiff's customers.[24] Glamorgan was to pay Plaintiff a fee of three percent of the purchase price for Plaintiff's marketing and sales efforts.[25]

Later in 2005, Plaintiff made four separate purchases totaling 30,000 tons of metallurgical coal and 10,000 tons of steam coal at a price of $2,984,430.[26]  Glamorgan agreed to process and store the coal for shipment by rail at a later date upon Plaintiff's

---

[21]     Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Report p. 3.

[22]     The copy of the general contract between Plaintiff and Glamorgan that was submitted to the court is not signed by either party.  See Doc. 33-5, Ex. E to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. ("Defs.' Resp."), Agreement p. 6.  Plaintiff reported to the claims investigator that the agreement was never executed by the parties.  See Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Report p. 3.  The court refers to the agreement simply for the general nature of Plaintiff's relationship with Glamorgan.

[23]     See Doc. 33-5, Ex. E to Defs.' Resp., Agreement p. 2.

[24]     See id.

[25]     See id. p. 3.

[26]     Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement p. 1 (unnumbered).

request.[27]  According to two purchase orders dated July 29, 2005,
one for 10,000 tons of steam coal and one for 10,000 tons of
metallurgical coal, title to the coal passed to Plaintiff upon
payment to Glamorgan, "regardless of the location of the coal."[28]
Additionally, Glamorgan warranted that it was "holding the coal,
free of any encumbrances, liens, etc., in inventory at the rail
loading facility."[29]  Plaintiff paid at least ninety-five percent
of the price of the coal in advance.[30]

During September and October, Glamorgan produced greater
quantities of coal than it had up to that point, but Plaintiff
requested that Glamorgan hold the coal due to mounting stockpiles

---

[27]   Id. pp. 1-2.

[28]   Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss
Statement, Attachs., Purchase Order Nos. STM1024-05 & MET3133-05.  The court
notes that neither of these purchase orders is signed by either party, and the
record does not include purchase orders for the other two metallurgical coal
purchases.  See id.  According to Ernie Thrasher ("Thrasher"), Plaintiff's
president, not all of the purchases at issue were initiated by purchase orders.
Doc. 34-2, Ex. 2 to Pl.'s Reply to Defs.' Resp. to Pl.'s Mot. for Partial Summ.
J., Thrasher's Decl. ¶¶ 8, 9.

[29]   Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss
Statement, Attachs., Purchase Order Nos. STM1024-05 & MET3133-05.

[30]   See Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's
Loss Statement p. 1 (unnumbered); Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial
Summ. J., Report pp. 2, 5.  The records submitted by Plaintiff as proof of
payment are not self-explanatory.  They include bank statements with wire-
transfer debits and checks registered without any indication of the recipients,
facsimile transmissions from Broughton to Unity Platform, L.P., (a company
related to Glamorgan) memorializing Broughton's affirmation that Plaintiff
transferred funds to Glamorgan, and a worksheet dated June 7, 2006, composed by
an unidentified source reflecting credit to Glamorgan.  See generally Doc. 27-2,
Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement, Attachs.
The only document that actually reflects payment to Glamorgan is a bank printout
that shows a wire transfer to Glamorgan on August 2, 2005, for $1,400,965.  Id.
Previous Day Detail Report.  The fact that Plaintiff paid most, if not all, of
the amount owed in advance does not seem to be disputed.  Doc. 27-7, Ex. 7 to
Pl.'s Mot. for Partial Summ. J., Report p. 2 (stating that Plaintiff paid in
advance to assist Glamorgan with ongoing cash-flow problems).

at Plaintiff's facility in Baltimore, Maryland.[31]  Ernie Thrasher
("Thrasher"), Plaintiff's president, visited the Glamorgan site
approximately four times between August and November 2005 and
believed that, at the time of his last visit, the stockpile
included a combined total of at least 60,000 tons of metallurgical
and steam coal.[32]

A warehouse receipt dated December 27, 2005, from Glamorgan
stated that Glamorgan, referred to therein as "the Warehouseman,"
received 30,000 net tons of high volatile coking coal on
Plaintiff's account for storage.[33]  The coal was "to be stored at
the Glamorgan's stockpile in or around Wise, Virginia."[34]  Glamorgan
"acknowledged receipt of notice of the Owner [Plaintiff] in the
goods," agreed to deliver the coal "upon demand to the Owner at
Glamorgan's stockpile in or around Wise, Virginia," and confirmed
that Plaintiff was "the sole owner of the goods herein described."[35]
A second warehouse receipt of the same date acknowledged receipt of
10,000 net tons of steam coal to be stored at Glamorgan's

---

[31]     Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Report p. 6.
According to the Report, Glamorgan was unable from the beginning of the
relationship to meet the specifications of Plaintiff's customers, and, therefore,
Plaintiff had the coal delivered to its facility in Baltimore, Maryland, for
blending with other products being stored there before delivery to customers.
Id. pp. 4-5.

[32]     Id. p. 8.

[33]     Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss
Statement, Attach., Warehouse Receipt No. 1 dated Dec. 27, 2005.

[34]     Id.

[35]     Id.

stockpile.[36]  The remaining language, terms, and conditions were the same as the warehouse receipt for the coking coal.[37]  Plaintiff first declared the Glamorgan coal for insurance purposes at the end of December 2005 because, according to Thrasher, it was only then that Glamorgan issued receipts.[38]

On March 31, 2006, Glamorgan shipped 4,718 net tons of steam coal to Baltimore, Maryland, pursuant to Plaintiff's request.[39] After that, Plaintiff repeatedly requested that Glamorgan ship the remaining coal, but Glamorgan refused to do so.[40]  In April 2006, Plaintiff arranged for empty rail cars to be delivered to the Glamorgan facility for loading of metallurgical coal, which yielded only 700 tons and was left at the Glamorgan facility in the rail cars.[41]

Glamorgan and related entities filed for bankruptcy in May 2006.[42]  Plaintiff filed an adversary proceeding in that action to

---

[36]    Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement, Attach., Warehouse Receipt No. 2 dated Dec. 27, 2005.

[37]    Compare Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement, Attach., Warehouse Receipt No. 1 dated Dec. 27, 2005 with Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement, Attach., Warehouse Receipt No. 2 dated Dec. 27, 2005.

[38]    Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Report p. 13.

[39]    Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement p. 2 (unnumbered).

[40]    Id.

[41]    Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Report p. 9.

[42]    Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement p. 2 (unnumbered).

gain possession of the stored coal but learned, in the course of
that proceeding, "that none of its coal was stockpiled at the Wise
facility."[43]   Alternatively, Glamorgan claimed that the mined coal
in the stockpile had been turned over several times after the
warehouse receipts were issued.[44]   Plaintiff sent an inspector to
the Glamorgan facility around May 17 or 18, 2006, and the inspector
reported the presence of both processed and unprocessed coal but
did not provide a measurement of the quantity.[45]

During the bankruptcy negotiations, counsel for the Glamorgan
entities represented that the execution of the warehouse receipts
was an accommodation to Plaintiff and that "[t]here was never any
coal existing at the facility to which the warehouse receipts could
attach."[46]   They claimed that the coal was still in the ground and
had not been mined.[47]   Plaintiff brought a fraud action against two
of Glamorgan's principals, claiming that the coal never existed and
that these individuals fraudulently misrepresented that fact to
Plaintiff.[48]

_____

[43]   Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss
Statement p. 2 (unnumbered); see also Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial
Summ. J., Report p. 10.

[44]   Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Report p. 11.

[45]   Id.

[46]   Id. p. 10.

[47]   Id.

[48]   See Doc. 33-1, Ex. A to Def.'s Resp., Verified Second Am. Compl. in
Civil Action No. 2:07-57 in the U.S. District Court for the Western District of
Virginia ¶¶ 39, 43, 47, 48, 56, 62.

On May 30, 2006, Thrasher sent a representative to the Glamorgan facility who confirmed that all of the coal had been removed from the property.[49]

## C.   Insurance Claims Process

On June 9, 2006, Plaintiff submitted a Property Loss Notice supported by a written statement by Gayle F. Broughton ("Broughton"), Plaintiff's vice president.[50]  Plaintiff filed the claim under the 2006-2007 renewed Policy and claimed the loss of 30,000 net tons of metallurgical coal and 5,282 net tons of steam coal with a total value of $2,743,481.74.[51]  Plaintiff claimed that Glamorgan had "stolen or illegally sold" the coal.[52]

In connection with its claim of loss, Plaintiff requested advice from Insurers with regard to the adversary proceeding in Glamorgan's bankruptcy action.[53]  In order for Plaintiff to meet ongoing obligations, Plaintiff requested a partial payment of $1,500,000.[54]

In a letter dated June 26, 2006, MMK International Marine

---

[49]    Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Report p. 12.

[50]    See Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Prop. Loss Notice.

[51]    See id.; Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement p. 2 (unnumbered).

[52]    Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Prop. Loss Notice.

[53]    Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement p. 2 (unnumbered).

[54]    Id. pp. 2-3 (unnumbered).

11

Services, Inc., ("MMK"), claims adjusters, notified Plaintiff that Insurers engaged CSL Claims Services ("CSL") to investigate Plaintiff's claim.[55]   MMK also relayed Insurers' reservation-of-rights letter.[56]   In their letter, Insurers presented multiple challenges to claim coverage and reserved all rights during the investigation of the claim.[57]

CSL issued a report on its investigation on August 2, 2006.[58] The investigator opined that, although Plaintiff made cash advances to Glamorgan, these sums were paid "largely to provide cash flow for the new and developing Glamorgan business as opposed to specific quantities of coal being purchased and thereby identified as relating to the respective invoices."[59]   Additionally, the investigator rejected Plaintiff's explanation as to why Plaintiff had not declared the stored coal for insurance purposes until the end of December 2005.[60]

On June 1, 2009, Defendants' attorneys issued a letter denying

---

[55]     Doc. 27-3, Ex. 3 to Pl.'s Mot. for Partial Summ. J., Letter from MMK to Plaintiff Dated June 26, 2006.

[56]     See id.

[57]     Doc. 27-3, Ex. 3 to Pl.'s Mot. for Partial Summ. J., Letter from Mutual Marine Office, Inc., to MMK Dated June 20, 2006.

[58]     Doc. 27-7, Ex. 7 to Pl.'s Mot. for Partial Summ. J., Report.

[59]     Id. p. 13.

[60]     Id. p. 14.

coverage.[61]   The denial was based on the 2005-2006 Policy period.[62]
The primary reasons for denial were: 1) no direct physical loss or
damage to insured goods because the coal was never in the care,
custody, and control of Plaintiff; and 2) failure to preserve
claims, waiver of subrogation, and impairment of recovery against
third parties because Plaintiff initiated an adversary proceeding
in the bankruptcy action and settled the claims with Glamorgan
without providing notice or requesting consent from Insurers and
failed to respond to Insurers' requests for information.[63]   The
letter also listed five other defenses to coverage.[64]

**D.   <u>This Lawsuit</u>**

Plaintiff filed this lawsuit against Insurers on February 24,
2011, for breach of contract, common law bad faith, and statutory
bad faith.[65]   The original complaint alleged that the 2005-2006
Policy covered the loss of coal.[66]

In July 2012, the parties timely filed motions for partial
summary judgment.[67]   About a month later, Plaintiff filed a motion

---

[61]     <u>See</u> Doc. 27-4, Ex. 4 to Pl.'s Mot. for Partial Summ. J., Letter from
Westmoreland Hall Maines & Lugrin, P.C., to Thrasher Dated June 1, 2009.

[62]     <u>See</u> <u>id.</u> p. 2.

[63]     <u>See</u> <u>id.</u> pp. 3-6.

[64]     <u>See</u> <u>id.</u> pp. 6-8.

[65]     <u>See</u> Doc. 1, Compl.

[66]     <u>See</u> <u>id.</u>

[67]     <u>See</u> Doc. 25, Pl.'s Mot. for Partial Summ. J.; Doc. 28, Def.'s Mot.
for Partial Summ. J.

for leave to amend the complaint, which was granted in September 2012.[68]   The amended complaint is virtually identical to the original complaint with the exception of the allegation that the claim is covered by the 2006-2007 Policy as well.[69]

In October 2012, Defendants filed a motion to exclude the testimony of Plaintiff's expert on claims handling and bad faith.[70] Between that time and the end of 2012, the court handled several nondispositive issues.[71]   In February 2013, Defendants answered Plaintiff's amended complaint.[72]

The court now takes under consideration the two pending dispositive motions, leaving the motion to exclude expert testimony for a later date.

## II.  Applicable Law

Procedurally, these motions are governed by Federal Rule of Civil Procedure 56.   Substantively, principles of insurance law guide the court's consideration.

## A.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that

---

[68]    See Doc. 35, Pl.'s Mot. for Leave to Amend; Doc. 42, Order Dated Sept. 21, 2012.

[69]    Compare Doc. 1, Compl. with Doc. 43, Am. Compl.

[70]    See Doc. 50, Mot. to Exclude Expert Testimony.

[71]    See, e.g., Doc. 52, Min. Entry Dated Oct. 23, 2012; Doc. 61, Order Dated Dec. 3, 2012.

[72]    See Doc. 64, Answer.

14

no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show that the facts are not in dispute, the party opposing summary judgment must go beyond the pleadings and proffer evidence demonstrating that genuine issues of material fact do exist that must be resolved at trial.  See Celotex Corp., 477 U.S. at 324.

When considering the evidence, "[d]oubts are to be resolved in

favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

B.  **Insurance Contract Interpretation**

Under Texas law,[73] the insured generally bears the initial burden of establishing that there is coverage under an applicable insurance policy, while it is the insurer's burden to prove the applicability of an exclusion permitting it to deny coverage.  See Lincoln Gen. Ins. Co. v. Reyna, 401 F.3d 347, 350 (5th Cir. 2005)(applying Texas law in the context of duty to defend); Guar. Nat'l Ins. Co. v. Vic Mfg. Co., 143 F.3d 192, 193 (5th Cir. 1998)(same).  If the insurer is successful, the burden shifts back to the insured to prove that an exception to the exclusion applies. Vic Mfg. Co., 143 F.3d at 193.

Insurance policies are subject to the rules of contract interpretation.  Tanner v. Nationwide Mut. Fire Ins. Co., 289 S.W.3d 828, 831 (Tex. 2009).  In construing the terms of a written contract, the court's primary purpose is always to "ascertain the

---

[73]    The parties apparently agree that Texas law applies to this insurance dispute.  See Doc. 26, Brief in Support of Pl.'s Mot. for Partial Summ. J. pp. 3-6 (citing Texas insurance law); Doc. 28, Defs.' Mot. for Summ. J., pp. 5-6 (same).

true intent of the parties as expressed in the instrument." <u>Nat'l</u>
<u>Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus.</u>, 907 S.W.2d
517, 520 (Tex. 1995); <u>see also</u> <u>Tanner</u>, 289 S.W.3d at 831.  To this
end, the court reads all provisions within the contract as a whole
and gives effect to each term so that no part of the agreement is
left without meaning.  <u>MCI Telecomms. Corp v. Tex. Utils. Elec.</u>
<u>Co.</u>, 995 S.W.2d 647, 652 (Tex. 1999).  Courts construe terms in
contracts to have their plain, ordinary meaning unless something in
the contract itself indicates that the parties intended for them to
have particular definitions.   <u>Tanner</u>, 289 S.W.3d at 831.

When a contract as worded can be given "a definite or certain
legal meaning," then it is unambiguous as a matter of law, and the
court enforces it as written.  <u>CBI Indus.</u>, 907 S.W.2d at 520; <u>see</u>
<u>also</u> <u>Fiess v. State Farm Lloyds</u>, 202 S.W.3d 744, 746 (Tex. 2006).
The court will not find a contract ambiguous merely because the
parties advance conflicting interpretations. <u>Kelley-Coppedge, Inc.</u>
<u>v. Highlands Ins. Co.</u>, 980 S.W.2d 462, 465 (Tex. 1998).  If,
however, the court finds an exclusion to be ambiguous, the court
must construe it in favor of the insured as long as that
construction is not unreasonable.  <u>Evanston Ins. Co. v. ATOFINA</u>
<u>Petrochems., Inc.</u>, 256 S.W.3d 660, 668 (Tex. 2008); <u>Fiess</u>, 202
S.W.3d at 746.  The court must adopt the insured's interpretation,
if it is not unreasonable, even if the interpretation offered by
the insurer is more reasonable or a more accurate reflection of

17

intent.   ATOFINA Petrochems., Inc., 256 S.W.3d at 668.

### III. Analysis

Plaintiff moves for summary judgment in its favor finding that Plaintiff's loss of coal is covered under the 2005-2006 all-risks Policy.   Defendants seek partial summary judgment that their liability, if any, is limited to $1,000,000 per the Policy terms. The court addresses these two very different issues separately.

### A. Coverage

Plaintiff contends that it is entitled to coverage for the loss of 30,000 tons of metallurgical coal and 4,261[74] tons of steam coal under the 2005-2006 Policy issued by Defendants.   Plaintiff argues that Insurers have admitted that the Policy covers all perils except those explicitly excluded and that Plaintiff is a named insured.   Insurers also have admitted, according to Plaintiff, that metallurgical and steam coal fit within the Policy's definition of "Goods Insured."   As further evidence that the coal was insured, Plaintiff points to the fact that it declared the 40,000 tons of coal in question and paid premiums on that amount beginning in December 2005.   The undisputed facts, argues Plaintiff, also establish that the coal was physically lost

---

[74]   Plaintiff's motion brief and its amended complaint both state that Glamorgan shipped 5,739 net tons of steam coal upon Plaintiff's request.   Doc. 26, Brief in Support of Pl.'s Mot. for Partial Summ. J. p. 8; Doc. 43, Am. Compl. p. 4.   The brief cites Broughton's loss statement as support.   Doc. 26, Brief in Support of Pl.'s Mot. for Partial Summ. J. p. 8.   However, Broughton stated that Glamorgan shipped only 4,718 net tons of steam coal.   Doc. 27-2, Ex. 2 to Pl.'s Mot. for Partial Summ. J., Broughton's Loss Statement p. 2 (unnumbered).   This discrepancy is not relevant to the court's consideration of the pending motions.

sometime between November 2005 and May 2006 as a result of Glamorgan's acts, omissions, and/or misconduct. Finally, Plaintiff contends that the loss was fortuitous from Plaintiff's standpoint because it was unknown and dependent upon chance even though due to the acts of Glamorgan.

Defendants respond with a list of facts they contend are disputed: 1) whether the coal actually existed; 2) if it did, whether title to the coal passed to Plaintiff, giving Plaintiff an insurable interest; 3) whether the warehouse receipts were rescinded by Glamorgan; and 4) whether the claimed loss fell within the Policy period. The fourth of these appears to have been addressed by Plaintiff's amendment of the complaint to add the 2006-2007 Policy period. However, the first of these is a disputed fact that prevents the court from ruling in favor of Plaintiff as a matter of law. The court need not consider the others.

Language in the purchase orders purported to give Plaintiff ownership of the coal upon payment and required Glamorgan to store it until requested by Plaintiff. The December 2005 warehouse receipts affirmed that Glamorgan was storing 40,000 tons of coal in its stockpile for Plaintiff and visits by Plaintiff's representatives confirmed the presence of a stockpile of coal.

On the other hand, Plaintiff's failure to declare the coal to Insurers until December 2005 is evidence that Plaintiff did not acknowledge the existence of stored coal at Glamorgan's facility

19

immediately after title purportedly transferred to Plaintiff and the coal was allegedly being stored by Glamorgan. Moreover, in the bankruptcy proceedings, Glamorgan admitted that none of Plaintiff's coal was stockpiled but remained unmined and that Glamorgan completed the warehouse receipts as a mere accommodation to Plaintiff. Plaintiff pursued a fraud action based on Glamorgan's misrepresentation of the existence of the coal.

None of the evidence is conclusive as to the existence or nonexistence of the coal. It is not the court's job to weigh the evidence or to decide the most reasonable inference to be drawn from it; that is the task assigned to the jury.

Whether the coal existed is critical to the coverage issue. The Policy covered all risks of loss to the subject matter insured and defined "Goods Insured" to include stored coal. If no coal was actually stored, ipso facto, there were no goods insured by the Policy. Plaintiff's motion for partial summary judgment should be denied on this basis alone.

**B.   Policy Limit**

Defendants move for partial summary judgment regarding the Policy limit, should it be determined that Plaintiff's claim is covered by the Policy.[75] They argue that the $1,000,000 limit "in respect of any one storage location" applies to the coal allegedly

---

[75]     Defendants assume the existence of the coal for purposes of their motion. See Doc. 28, Defs.' Mot. for Partial Summ. J. p. 2.

20

stored at Glamorgan.

Plaintiff responds with a list of issues it contends involve disputed facts: 1) whether the Policy limit was intended to apply to Plaintiff's claim; 2) whether Plaintiff is insured up to the full value of the coal because it reported and paid a premium on the full value and Insurers "endorsed to the Policy" a premium based on the full value; and 3) whether the "sue and labor" coverage is in addition to any Policy limit.[76]  The third of these is not the subject of Defendants' pending motion[77] and, accordingly, is not addressed at this time.  The other two points are matters of policy interpretation.

According to Plaintiff's interpretation of the Policy, payment of a premium based on the total value of the coal (which Plaintiff valued at $3,124,141) entitled Plaintiff to coverage for the full amount regardless of any applicable Policy limit.  Plaintiff points to the affidavit of its vice president, Broughton, who affirmed that to be what Plaintiff "understood."[78]  Plaintiff further contends that the $1,000,000 limit "applie[d] only to goods in storage at a location that was not reported to Insurers and for which [Plaintiff] did not pay premiums," citing Broughton's

---

[76]    Doc. 29, Pl.'s Resp. to Defs.' Mot. for Partial Summ. J. p. 1.

[77]    Doc. 32, Defs.' Reply to Pl.'s Resp. to Defs.' Mot for Partial Summ. J. pp. 9-10.

[78]    See Doc. 29-4, Ex. 3 to Pl.'s Resp. to Defs.' Mot for Partial Summ. J., Broughton's Aff. ¶ 6.

affidavit.[79]  Plaintiff also points to the testimony of the Policy underwriter, who stated that the $1,000,000 limit allowed an insured to avoid reporting goods that "come in and out of a warehouse with limits below one million" but still have those goods covered.[80]  The court finds Plaintiff's reading of the Policy to be unreasonable.

The fact of the matter is that nothing in the Policy provided a method for Plaintiff to raise coverage limits by increasing premium payments and nothing in the Policy reflected the underwriter's opinion that Plaintiff was not required to report stored goods valued at less than $1,000,000.  The two issues, coverage limits and value declarations, were addressed in two independent provisions that make no reference to each other.

The only provision in the Policy that listed coverage limits was the "Limits of Liability" section.  That provision set limits for stored goods according to their storage location.  For example, the Policy stated that goods stored in Newport News, Virginia, were covered for values up to $15,000,000 and goods stored at Sociedad Portuaria Regional de Baranquilla S.A., Calle 1, Carrera 36, Orilla del Rio, Barranquilla, Columbia, were covered for values up to

---

[79]     Id. ¶ 7.

[80]     Doc. 29-5, Ex. 4 to Pl.'s Resp. to Defs.' Mot. for Partial Summ. J., Andrew Fossler's Dep. p. 38.

$3,000,000.[81]   Except for the ten specifically identified storage locations, the limit "in respect of any one storage location" was $1,000,000.[82]   This provision did not provide for the modification of these limits through the payment of excess premiums or contain any exceptions to the stated limit for any one storage location.

In a completely separate section of the Policy, labeled "Attaching and Expiry Dates and Declarations," the method for reporting risks and determining associated monthly premiums was explained.   The onus was on Plaintiff to report "all shipments and/or other risks coming within the terms and conditions of this Policy."[83]   The reporting of such risks and the amounts declared was mandatory; in fact, the intentional failure to report covered risks[84] rendered the Policy null and void at the option of Insurers. This provision did not mention special rules for reporting or not reporting goods valued at less than $1,000,000 and did not refer to coverage limits at all.

Neither of these sections supports Plaintiff's position that

---

[81]   Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy, Declarations p. 3.

[82]   Id.

[83]   Id. p. 1.

[84]   The court notes that the Policy required Plaintiff to report risks that came within the terms and conditions of the Policy.   The court makes no ruling whether goods valued in excess of the applicable Policy coverage limit came within the terms and conditions of the Policy.   The court need not decide this issue or whether Plaintiff overpaid premiums for the Glamorgan coal because, even if Plaintiff did, the coverage limits were not affected per the clear language of the Policy.

23

it could report higher values than covered, pay additional premiums and, thereby unilaterally raise the Policy limits. According to the plain language of the Policy, the limits of liability were not altered by the amounts declared. There simply was no language remotely suggesting that the $1,000,000 limit for a single storage location was subject to monthly fluctuation based on Plaintiff's declarations. To allow Plaintiff's interpretation would raise the question as to why the Policy set coverage limits at all, much less very detailed limits, if they were solely based on the amounts Plaintiff declared.

Plaintiff points the court to two endorsements that reflect the premiums due by Plaintiff for December 2005 and January 2006.[85] Neither contained language affecting the coverage limits or, for that matter, broke down the premium charged according to the location of the declared risks. These endorsements, which related solely to the monthly premiums charged, specifically stated that "all other terms and conditions remain unchanged."[86] By no stretch of the imagination can these endorsements be read to raise the coverage limit for the Glamorgan coal.

As no language in the Policy supports Plaintiff's "understanding" of coverage limits, it is no wonder that Plaintiff asks the court to consider the affidavit of its vice president and

---

[85]    See Doc. 27-1, Ex. 1 to Pl.'s Mot. for Partial Summ. J., Ocean Marine Open Cargo Policy, Endorsement Nos. 17 & 18.

[86]    Id.

the deposition testimony of the Policy underwriter. Their testimony certainly presents a different understanding of the Policy terms from that of the court, so different, in fact, that it does not reflect the actual terms of the Policy at all. The Policy is unambiguous, and the court cannot countenance the use of extraneous evidence to create an ambiguity where none exists.

Plaintiff's interpretation of the Policy is unreasonable, and Defendants' interpretation is consistent with the plain language of the Policy. The court, therefore, finds that summary judgment should be granted in Defendants' favor as to the $1,000,000 coverage limit.

### IV.   Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment be **DENIED** and that Defendants' Motion for Partial Summary Judgment be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such

25

objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

     **SIGNED** in Houston, Texas, this <u>28</u><sup>th</sup>  day of February, 2013.

Nancy K. Johnson<br>
United States Magistrate Judge